Barry I. Levy
Michael A. Sirignano
Michael Vanunu
Philip P. Nash
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                          Plaintiffs,

                                                              **Plaintiff Demands a Trial by Jury**

          -against-

MONAC SUPPLY INC., VUE SUPPLY INC.,
BANDB SUPPLY INC., WESTEND SUPPLY INC.,
VIACHESLAV BOBKOV, and JOHN DOE
DEFENDANTS "1" –"10",

                          Defendants.
-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $357,000.00 that Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of

1

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") devices such as cold therapy units ("CTUs"), continuous passive motion ("CPM") machines, pulsed electromagnetic field devices ("PEMF Devices"), osteogenesis stimulators ("Osteo Stim Devices"), infrared heating pads with low level light therapy ("LLLT Devices"), pneumatic compression therapy devices ("PCT Devices"), deep vein thrombosis prevention devices ("DVT Devices"), and sustained acoustic medicine ("SAM") units, etc. (collectively, the "Fraudulent Equipment") through Defendants Monac Supply Inc. ("Monac Supply"), Vue Supply Inc. ("Vue Supply"), BandB Supply Inc. ("BandB Supply"), and Westend Supply Inc. ("Westend Supply") (collectively, the "DME Entities") to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2. The DME Entities purport to be owned by Viacheslav Bobkov ("Bobkov", and collectively with the DME Entities, the "Defendants"). Bobkov devised a scheme in conjunction with others not readily identifiable to GEICO to obtain medically unnecessary prescriptions for expensive pieces of Fraudulent Equipment, including duplicated/photocopied prescriptions, from healthcare providers working out of no-fault clinics and ambulatory surgical centers in the New York metropolitan area (the "Referring Providers") through unlawful kickbacks and other financial incentives. Once the prescriptions were secured, Defendants then billed GEICO collectively more than $2.8 million. As part of their scheme to avoid detection and extract money from GEICO, Defendants also submitted phony invoices from a fake DME wholesaler in an effort to misrepresent the illusory reimbursement rates they charged to GEICO.

3. GEICO seeks to recover more than $357,000.00 that has been wrongfully obtained by Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement

of more than $2.2 million in pending No-Fault insurance claims that have been submitted on behalf

of Defendants because:

    (i)    The Defendants billed GEICO for Fraudulent Equipment when they were not entitled to collect No-Fault Benefits because they failed to comply with local licensing requirements.

    (ii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed as a result of unlawful financial arrangements with others who are not presently identifiable;

    (iii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and provided pursuant to predetermined fraudulent protocols designed to exploit Insureds for financial gain, without regard for genuine patient care;

    (iv)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent any was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions; and

    (v)    To the extent that any equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

4.    The Defendants fall into the following categories:

    (i)    Defendants Monac Supply, Vue Supply, BandB Supply, and Westend Supply are each New York corporations that purport to purchase DME from wholesalers, purport to provide Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for providing Fraudulent Equipment.

    (ii)    Defendant Bobkov is listed as the owner and purports to operate and control Monac Supply, Vue Supply, BandB Supply, and Westend Supply and used the DME Entities to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

    (iii)    John Doe Defendants 1-10 are citizens of New York and are presently not identifiable but are associated with the Referring Providers and various surgical centers or medical offices that purportedly treat a high-volume of No-Fault insurance patients (the "Clinics"), and who have conspired with

Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

5.      As discussed below, Defendants have always known that the claims for the Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)      The Fraudulent Equipment was provided – to the extent any was provided – based upon prescriptions received as a result of unlawful financial arrangements between Defendants and others who are not presently identifiable, not because the Fraudulent Equipment was medically necessary;

(ii)     The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any equipment was provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants and others not presently known rather than to treat or otherwise benefit the Insureds;

(iii)    The Fraudulent Equipment was provided – to the extent any was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(iv)     To the extent that any equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment; and

(v)      The bills for Fraudulent Equipment submitted by Defendants to GEICO fraudulently misrepresented that Defendants complied with all local licensing requirements when Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection as Monac Supply, BandB Supply, and Westend Supply failed to obtain a license and Vue Supply misrepresented their business address in their licensing application.

6.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Entities.

7.      The chart attached hereto as Exhibits "1" – "4" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants fraudulent scheme.

8.      The Defendants fraudulent scheme involving the DME Entities against GEICO and the New York automobile insurance industry began no later than August 2022 and the scheme has continued uninterrupted since that time.

9.      As a result of Defendants' fraudulent schemes, GEICO has incurred damages of more than $357,000.00.

## THE PARTIES

### I.      Plaintiffs

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.      Defendants

11.      Defendant Monac Supply is a New York corporation with its principal place of business in Brooklyn, New York.  Monac Supply was incorporated on September 7, 2022, is owned, operated and controlled by Bobkov, and has been used by Bobkov, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

12.      Defendant Vue Supply is a New York corporation with its principal place of business in Brooklyn, New York.  Vue Supply was incorporated on May 11, 2023, is owned, operated and controlled by Bobkov, and has been used by Bobkov, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.    Defendant BandB Supply is a New York corporation with its principal place of business in Brooklyn, New York.  BandB Supply was incorporated on July 12, 2023, is owned, operated and controlled by Bobkov, and has been used by Bobkov, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.    Defendant Westend Supply is a New York corporation with its principal place of business in Brooklyn, New York.  Westend Supply was incorporated on January 17, 2024, is owned, operated and controlled by Bobkov, and has been used by Bobkov, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.    Defendant Bobkov resides in and is a citizen of New Jersey. Bobkov is not and has never been a licensed healthcare provider. Bobkov owns, operates, and controls the DME Entities, which are all New York entities, and entered into agreements with others who are not presently identifiable in order for the DME Entities to obtain prescriptions for the Fraudulent Equipment purportedly issued by the Referring Providers.

## **JURISDICTION AND VENUE**

16.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants reside.

**ALLEGATIONS COMMON TO ALL CLAIMS**

20.    GEICO underwrites automobile insurance in the State of New York.

**I.    An Overview of the Pertinent Laws**

**A.    Pertinent Laws Governing No-Fault Insurance Reimbursement**

21.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

22.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

24.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule.

25.    Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

27.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

28.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

29.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP").  <u>See</u> NYC Admin. Code §20-426.

30.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

31.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

32.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

33.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

34.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto . . ., commits a fraudulent insurance act, which is a crime.

35.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Regulations Governing No-Fault Benefits for DME**

36.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

37.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as CPMs, CTUs, bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, ad cervical traction units.

38.    Effective on April 4, 2022, the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

39.    According to the Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for that specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

10

40.     The Fee Schedule also includes the maximum weekly rental charge for certain Fee Schedule Items.

41.     Where a specific piece of DME does not have a maximum reimbursement rate in the Fee Schedule ("Non-Fee Schedule item"), then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

42.     Effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for rental charges of DME that does not have a reimbursement rate in the Fee Schedule or is not specifically identified within the Fee Schedule.

43.     However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of the rental of certain Non-Fee Schedule items, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the Fee Schedule.

44.     Specifically, this emergency amendment capped the total rental of Non-Fee Schedule items to Insureds, including items rented under HCPCS Code E1399, at the lesser of: (1) the acquisition cost (*i.e.* the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

45.     For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

(d)(1)  On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider.  Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.

(2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)    Acquisition cost plus 50%;

(ii)   Usual and customary price charged by durable medical equipment providers to the general public; or

(iii)  Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

46.    In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at $1/300^{th}$ of the acquisition cost and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

47.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)   The prescription for DME is not based any unlawful financial arrangement;

(iii)  The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)   The HCPCS Code identified in the bill actually represents the DME that was provided to the patient;

(v)    The fee sought for DME provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item; or

(vi)     The *pro rata* monthly rental fee sought for renting DME to an Insured was not in excess of the standard for calculating rental reimbursement.

## II.     The Defendants' Fraudulent Schemes

### A.     Overview of Defendants' Fraudulent Scheme

48.     Beginning in 2022, Bobkov, together with the John Doe Defendants, conceived and implemented a complex fraudulent scheme in which the DME Entities were used as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits which Defendants were never entitled to receive.

49.     Bobkov used the DME Entities to directly obtain No-Fault benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for different types of Fraudulent Equipment billed through each of the DME Entities.

50.     Between August 2022 and the present, Defendants submitted more than $2.8 million in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment. To date, Defendants have wrongfully obtained more than $357,000.00 from GEICO, and there is more than $2.2 million in additional fraudulent claims that have yet to be adjudicated but for which Defendants continue to seek payment from GEICO.

51.     The scheme began with Babkov, through Monac Supply, receiving prescriptions for specifically targeted DME, including photocopied prescriptions, purportedly issued by Referring Providers for the rental of CPMs, DVT Devices, CTUs, and SAM Units to Insureds after arthroscopic surgery, and billing GEICO for No-Fault Benefits at drastically inflated rental rates between August 2022 and February 2023.

52.     Babkov and the John Doe Defendants then shifted the scheme from rental prescriptions to prescriptions that purport to claim the Fraudulent Equipment should be "sold" to

Insureds. In reality, this change in the scheme was to further inflate the reimbursement amounts sought from GEICO and other New York automobile insurance companies and exploit the reimbursement standards under the No-Fault Laws.

53.    For example, between May 2023 and July 2023, Babkov used Vue Supply to bill GEICO for purporting "selling" CTUs and SAM Units to Insureds after arthroscopic surgeries when the same type of Fraudulent Equipment was previously rented to Insureds through Monac Supply.

54.    In addition, the change in the fraudulent scheme included Babkov with the assistance of the John Doe Defendants obtaining prescriptions from Clinics that were used as a basis to bill GEICO, and other automobile insurers, through BandB Supply and Westend Supply for "selling" Fraudulent Equipment to Insureds. For example, between October 2023 and July 2024, Babkov used BandB Supply to bill GEICO primarily for "selling" CTUs, PEMF Devices, PCT Devices, LLLT Devices, and Osteo Stim Devices.

55.    In conjunction with the billing submitted through BandB Supply, Babkov used Westend Supply between March 2024 and July 2024 to simultaneously bill GEICO for "selling" PEMF Devices, LLLT Devices, and CTUs, with prescriptions for Fraudulent Equipment being split between BandB Supply and Westend Supply to mask fraudulent scheme.

56.    The Defendants' scheme was designed to exploit New York's No-Fault insurance system by targeting the prescription and dispensing of Fraudulent Equipment because many of these devices were either expensive Fee Schedule items, or where items which have no specific billable code and no specific reimbursement amount, which Defendants used to bill GEICO at drastically inflated rates that are far beyond what Defendants were actually entitled to receive.

57.     The Defendants continued to hide their fraudulent scheme by submitting fabricated invoices to justify the exorbitant reimbursement rates charged to GEICO. For example, Westend Supply submitted fake invoices for the purported purchase of DME from Top Notch Wholesale Inc., which is not a DME wholesaler but a shell-company used to funnel money.

58.     The Defendants were able to perpetrate the fraudulent scheme against GEICO by obtaining prescriptions for expensive pieces of Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with the John Doe Defendants that are associated with the Clinics and surgery centers, and are not presently identifiable.

59.     The DME Entities did not market or advertise to the general public, lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

60.     Similarly, Bobkov did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

61.     Instead, Defendants entered illegal, collusive agreements with the John Doe Defendants so that large volumes of prescriptions purportedly issued by the Referring Providers could be steered to the DME Providers for the specifically targeted Fraudulent Equipment.

62.     The prescriptions for Fraudulent Equipment were the result of unlawful collusive agreements with the John Doe Defendants and were not for legitimately, medically necessary items, because they: (i) contained a photocopied or stamped signature of the Referring Provider who purportedly issued the prescription; and/or (ii) were issued on a date the Referring Provider never treated or otherwise examined the Insured.

63.     Once Defendants received these phony prescriptions, Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for Fraudulent Equipment that was purportedly provided to the Insureds.

64.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment, Defendants indicated that they provided Insureds with Fraudulent Equipment that was medically necessary as determined by a healthcare provider licensed to prescribe DME, when in actuality none of the charges identified in Exhibits "1" – "4" were for medically necessary Fraudulent Equipment.

65.     After obtaining medically unnecessary prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers, Defendants would bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment at grossly inflated reimbursement rates; and (iv) Fraudulent Equipment that was otherwise not reimbursable.

**B.      Defendants' Failure to Comply with Local Licensing Provisions**

66.     As stated above, for a DME supplier to provide DME to automobile accident victims within the City of New York, the DME supplier must obtain a Dealer in Products License by the DCWP.

67.     For Defendants to lawfully provide DME to the Insureds identified in Exhibits "1" through "4", the DME Entities were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "4" were located within the City of New York.

16

68.     However, Monac Supply, BandB Supply, and Westend Supply failed to obtain a Dealer in Products License from the DCWP.

69.     As such, Monac Supply, BandB Supply, and Westend Supply billed GEICO without complying with all significant statutory and regulatory requirements to operate as a DME supplier within the City of New York.

70.     While Vue Supply did obtain a Dealer in Products license, it was still not eligible to collect No-Fault Benefits from GEICO and other automobile insurers because they obtained their Dealer in Products license through fraud and/or misrepresentations.

71.     As part of obtaining a Dealer in Products License, Bobkov, on behalf of Vue Supply completed a license application form that required it to identify – among other things – the commercial address of where Vue Supply physically operated from.

72.     Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

73.     However, and in support of the fact that Defendants' scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, Bobkov knowingly provided false information in the Dealer in Products License application filed on behalf of Vue Supply.

74.     Bobkov falsely affirmed that Vue Supply operated or conducted business from the 164 Brighton 11th St., Ste. 5, Brooklyn, New York (the "Brighton 11th St. Address").

75.     In support of the fact that the Dealer in Products license application contained a false affirmation regarding the business address of Vue Supply, the billing submitted by Vue Supply to GEICO contained a "Delivery Receipt" on Vue Supply letterhead indicating their address was 414 Brighton Beach Ave., Brooklyn New York (the "Brighton Beach Ave. Address"). An example of the Delivery Receipt showing the Brighton Beach Ave. Address is as follows:

**Vue Supply Inc**
**414 Brighton Beach AVe**
**Brooklyn, NY, 11235-6405**
Tel: 347-443-9852
Fax:
Email: VUESUPPLY@GMAIL.COM

## DELIVERY RECEIPT

76.    GEICO investigators attempted to verify the Brighton Beach Ave. Address in June 2023 and observed at the location a psychic and a school of music. There was no signage or any indication Vue Supply operated from this location.

77.    Bobkov knowingly provided false information regarding Vue Supply's business addresses to induce the DCWP to issue a license, which would give Vue Supply the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers.

78.    Similar to Monac Supply, BandB Supply, and Westend Supply, by providing false information in its Dealer in Products application to the DCWP Vue Supply billed GEICO without complying with all significant statutory and regulatory requirements to operate as a DME supplier within the City of New York.

79.    Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements.

80.    In each of the claims identified in Exhibits "1" through "4", Defendants knowingly misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME to Insureds, when Defendants were never eligible to collect No-Fault Benefits in the first instance, because Monac Supply, BandB Supply, and Westend Supply never obtained Dealer in Products Licenses, and because Vue Supply did not lawfully obtain a Dealer in Product License.

C.    **The Defendants' Illegal Financial Arrangements**

81.    In order to obtain access to Insureds so Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits Defendants could obtain from GEICO and other New York automobile insurers, Defendants entered into illegal agreements with the John Doe Defendants where prescriptions for Fraudulent Equipment were provided to Defendants in exchange for financial consideration.

82.    The Defendants engaged in unlawful financial arrangements with the John Doe Defendants in order to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers. These schemes allowed Defendants to submit hundreds of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

83.    As part of the unlawful financial arrangements, in order to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers Defendants would pay thousands of dollars in kickbacks to the John Doe Defendants or to fictitious businesses that existed for no legitimate purpose at the direction of the John Doe Defendants.

84.    Through participating in unlawful financial arrangements, Bobkov was able to obtain prescriptions for Monac Supply and purport to provide the Fraudulent Equipment to Insureds starting on August 23, 2022, 15 days <u>before</u> Monac Supply was even incorporated, which was on September 7, 2022.

85.    In keeping with the fact that Defendants paid kickbacks to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers, Babkov issued payments to NYA Services USA Inc. ("NYA Services"), Top Notch Wholesale Inc. ("Top Notch Wholesale"), and Irina Zayonts ("Zayonts"), for no legitimate purpose.

86.    For example, Westsend Supply gave a $5,000.00 check to Zayonts, who is no stranger to fraudulent insurance schemes. Zayonts was indicted in the Southern District of New York in 2012 in connection with a $300 million no-fault insurance fraud scheme. Zayonts pled guilty to various counts in 2014 and was sentenced to probation. In addition, Zayonts has been named as a defendant in multiple lawsuits by GEICO where Zayonts was alleged to in-part control the operations of medical and psychological practices by directing unlicensed individuals to perform healthcare services on Insureds that were then billed to GEICO as falsely being provided by licensed healthcare providers. See Gov't Emps. Ins. Co. v. Poonawala, et al., 1:22-cv-03063-PKC-VMS (E.D.N.Y. 2022); Gov't Emps. Ins. Co. v. Grody, et al., 1:22-cv-03598-BMC (E.D.N.Y. 2022); Gov't Emps. Ins. Co. v. Tenenbaum, et al., 1:22-cv-04543-ARR-LKE (E.D.N.Y. 2022); Gov't Emps. Ins. Co. v. Susan J. Polino, et al., 1:22-cv-04543-ARR-PK (E.D.N.Y. 2022); Gov't Emps. Ins. Co. v. Grody, et al., 1:22-cv-06187-RER-PK (E.D.N.Y. 2022); Gov't Emps. Ins. Co. v. Bily-Linder, et al., 1:23-cv-00515-FB-RML (E.D.N.Y. 2023); Gov't Emps. Ins. Co. v. Green Power New York LLC, et al., 1:23-cv-1304-HG (E.D.N.Y. 2023); Gov't Emps. Ins. Co. v. Puzaitzer, et al., 1:23-cv-07465-DLI-VMS (E.D.N.Y. 2023); and Gov't Emps. Ins. Co. v. Grody, et al., 1:24-cv-04125-FB-MMH.

87.    In addition, Defendants, through BandB Supply and Westend Supply, paid approximately $31,000.00 to NYA Services and approximately $22,500.00 to Top Notch Wholesale as part of Defendants participation in an illegal kickback scheme to obtain prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers.

88.    NYA Services and Top Notch Wholesale are shell companies owned by an individual named Arthur Gitlevich ("Gitlevich") that have been involved in no-fault fraudulent schemes.

89.     In almost all the cases identified above where Zayonts was named as a defendant, Top Notch Wholesale and NYA Services were used by Gitlevich to funnel kickback payments into cash. In fact, Top Notch Wholesale and NYA Services were named as defendants in Gov't Emps. Ins. Co. v. Grody, et al., 1:22-cv-06187-RER-PK, and Top Notch Wholesale was also named as a defendant in Gov't Emps. Ins. Co. v. Poonawala, et al., 1:22-cv-03063(PKC)(VMS).

90.     In addition, Gitlevich was also named as a defendant in Gov't Emps. Ins. Co. v. Grody, et al., 1:24-cv-04125-FB-MMH, for funneling money through in the same manner through another entity owned by Gitlevich.

91.     Gitlevich was able to funnel payments received to cash because virtually all the money received by Top Notch Wholesale and NYA Services was issued to ADG International, which is another entity owned by Gitlevich, and then cashed at a check-cashing facility in Pennsylvania.

92.     In fact, the money paid by Defendants to Top Notch Wholesale and NYA Services also resulted in being converted into cash at a check-cashing facility in Pennsylvania.

93.     In an attempt to induce GEICO into paying the fraudulent bills at the rates requested by Defendants, and to coverup the payments made to Top Notch Wholesale, Westend Supply included invoices from Top Notch Wholesale that purport to claim that Westend Supply purchased over $501,000.00 of DME from Top Notch Wholesale.

94.     A copy of the invoice from Top Notch Whole that Defendants submitted with their bills to GEICO is as follows:



95.    However, this invoice is a complete fabrication because Top Notch Wholesale is not an actual DME wholesaler. Instead, Top Not Wholesale, like other entities owned by Gitlevich, solely exists to funnel money into cash. In fact, Top Notch Wholesale has no business address, and

its purported address of 700 Welsh Road, No. 216, Huntingdon Valley, Pennsylvania is a residential apartment.

96.     Further, Gitlevich testified on behalf of himself and Top Notch Wholesale in connection with the Gov't Emps. Ins. Co. v. Poonawala case in April 2024 during which he confirmed the address used by Top Notch Wholesale is Gitelvich's home address and then asserted his 5th Amendment privilege against self-incrimination to virtually all questions, including questions regarding if Top Notch Wholesale performed any legitimate business services and if Top Notch Wholesale was formed solely to launder money as part of numerous no-fault insurance schemes.

97.     The Defendants participation in unlawful financial arrangements with others not presently identifiable is shown by the fact that Defendants obtained many prescriptions that contained a photocopied or duplicated signature of the Referring Provider that was used as a basis to bill GEICO for the medically unnecessary Fraudulent Equipment.

98.     For example, Defendants billed GEICO using virtually identical photocopied prescriptions purportedly issued by Robert Drazic, D.O. ("Drazic"), Anjani Sinha, M.D. ("Sinha"), Mario Leon, P.A. ("Leon"), and Natasha Jagga, N.P. ("Jagga").

99.     The following are examples of the virtually identical photocopied prescriptions:

<u>Prescriptions from Drazic</u>

| **Example** | **Sample photocopied / stamped signatures** |
|---|---|
| Drazic to **Monac Supply** dated 10/24/22 for Insured YT | *Robert Drazic* |
| Drazic to **Vue Supply** dated 4/17/2023 for Insured CG | *Robert Drazic* |

| | |
|---|---|
| Drazic to **Monac Supply** dated 10/28/2022 for Insured NT |  |
| Drazic to **Vue Supply** dated 5/15/2023 for Insured LH |  |

Prescriptions from Sinha

| **Example** | **Sample photocopied / stamped signatures** |
|---|---|
| Sinha to **Monac Supply** dated 11/3/2022 for Insured JC |  |
| Sinha to **Monac Supply** dated 11/3/2022 for Insured WN |  |
| Sinha to **Monac Supply** dated 10/27/2022 for Insured JA |  |

| Sinha to **Monac Supply** dated 10/27/2022 for Insured DB |  |
|---|---|

Prescriptions from Leon

| **Example** | **Sample photocopied / stamped signatures** |
|---|---|
| Leon to **Westend Supply** dated 5/20/2024 for Insured JP |  |
| Leon to **Westend Supply** dated 6/6/2024 for Insured CR |  |
| Leon to **Westend Supply** dated 6/3/2024 for Insured RM |  |
| Leon to **Westend Supply** dated 5/6/2024 for Insured DV |  |
| Leon to **BandB Supply** dated 5/20/2024 for Insured JP |  |
| Leon to **BandB Supply** dated 5/6/2024 for Insured CR |  |

| | | |
|---|---|---|
| Leon to **BandB Supply** dated 5/20/2024 for Insured YN | |  |
| Leon to **BandB Supply** dated 6/3/2024 for Insured RM | |  |

Prescriptions from Jagga

| **Example** | **Sample photocopied / stamped signatures** |
|---|---|
| Jagga to **Westend Supply** dated 7/11/2024 for Insured AC |  |
| Jagga to **Westend Supply** dated 7/2/2024 for Insured CM |  |
| Jagga to **Westend Supply** dated 7/11/2024 for Insured JV |  |
| Jagga to **Westend Supply** dated 7/2/2024 for Insured BA |  |
| Jagga to **BandB Supply** dated 6/6/2024 for Insured YP |  |

| | |
|---|---|
| Jagga to **BandB Supply** dated 6/6/2024 for Insured YM |  |
| Jagga to **BandB Supply** dated 7/11/2024 for Insured AR |  |
| Jagga to **BandB Supply** dated 7/2/2024 for Insured BA |  |

100. These are only representative examples. Many of the prescriptions purportedly issued by Drazic, Sinha, Leon, and Jagga contained duplicated photocopied signatures similar to samples above.

101. Additionally, as a result of Defendants participation in unlawful financial arrangements, Defendants: (i) obtained prescriptions from third-parties at the Clinics or surgical centers, not directly from the insureds; (ii)  received virtually identical predetermined sets of prescriptions from multiple Referring Providers; (iii) received prescriptions for Fraudulent Equipment purportedly issued by Referring Providers on dates the Referring Provider never treated or otherwise examined the Insured; and (iv) received prescriptions for Fraudulent Equipment that would not be provided by legitimate healthcare providers under identical circumstances.

102. But for Defendants' participation in unlawful financial arrangements, the John Doe Defendants who were associated with the Clinics and surgical centers and worked with the Referring Providers would not have: (i) directed the medically unnecessary prescriptions for Fraudulent Equipment directly to Defendants; (ii) make the Insureds' information available to

Defendants; and/or (iii) provide Defendants with forged, unauthorized, or illegally duplicated prescriptions for Fraudulent Equipment.

103.    In all the claims identified in Exhibits "1" – "4" Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers for medically necessary DME and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements and therefore never eligible for reimbursement.

**D.    The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

104.    In addition to the unlawful financial arrangements by Defendants, Defendants conspired with the John Doe Defendants to obtain medically unnecessary prescriptions for the Fraudulent Equipment, which were designed to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

105.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" – "4" were issued pursuant to predetermined fraudulent protocols that were established by Defendants and John Doe Defendants, not because the Fraudulent Equipment was medically necessary for each Insured based upon their individual symptoms or presentations.

106.    In all of the claims identified in Exhibits "1" – "4", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

107.    At the same time, almost none of the Insureds identified in Exhibits "1" – "4", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

108.    In keeping with the fact that the Insureds identified in Exhibits "1" – "4" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

109.    To the extent that the Insureds in the claims identified in Exhibits "1" – "4" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with a diagnosis no more serious than a minor soft tissue injury such as a sprain or strain.

110.    However, even though virtually all of the Insureds identified in Exhibits "1" – "4" were involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to similar treatment and obtained prescriptions for Fraudulent Equipment.

111.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" – "4" were issued pursuant to predetermined fraudulent protocols that were established by Defendants and others who are not presently identifiable, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

112.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

113.    In general, Monac Supply and Vue Supply obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers under the following pattern:

(i)    the Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)    the Insured would be seen by healthcare practitioner and would subsequently be issued multiple prescriptions for DME and pharmaceuticals, undergo multiple therapies, including chiropractic and physical therapy; generating unnecessary expense when the likelihood of "spontaneous recovery" was high;

(iii)    thereafter, the Insured would be referred to an orthopedic surgeon for complaints regarding one or more of the Insureds' extremities, such as a shoulder or knee;

(iv)    the orthopedic surgeon would then perform a relatively minor arthroscopic surgical procedure on one or more of the Insured's extremities at an ambulatory surgical center; and

(v)    as a result of the surgery, the orthopedic surgeon would purportedly issue prescriptions for the rental of a CTU, CPM, DVT Device, and/or a SAM Unit which would be directly provided to Monac Supply or Vue Supply to fill and was without any involvement by the Insured.

114.    By the time that Defendants operated through BandB Supply and Westend Supply, the protocol changed to obtaining prescriptions for medically unnecessary Fraudulent Equipment directly from Clinics, under the following pattern:

(i)    the Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident; and

(ii)    the Insured would be seen by a healthcare provider, who also purportedly issued multiple prescriptions for a CTU, a PEMF Device, a LLLT Device, a PCT Device, and an Osteo Stim Device (in addition to other DME) which would be directly provided to BandB Supply and Westend Supply to fill without any involvement by the Insured. The Insured would subsequently undergo multiple therapies, including chiropractic and physical therapy; generating unnecessary expense when the likelihood of "spontaneous recovery" was high.

115.    In reality, the prescriptions for Fraudulent Equipment provided to Defendants were not based on medical necessity but were part of predetermined fraudulent protocols and without regard for the Insureds individual presentation and/or ability for post-surgical recovery.

i.    **The Predetermined Prescription Protocol Involving Monac Supply and Vue Supply**

116.    In a legitimate setting, when a patient injured in a motor vehicle accident undergoes a minimally invasive surgery, such as the arthroscopic surgery performed on Insureds in Exhibits "1" and "2", the surgeon would evaluate the patient's individual circumstances to determine a specific course of post-surgical rehabilitation.

117.    Furthermore, in a legitimate setting, in determining a specific course of post-surgical rehabilitation, a surgeon may – but does not always – prescribe DME that should aid in the patient's surgical recovery.

118.    In determining whether to prescribe DME as part of a patient's surgical recovery – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing physical therapy; (iii) whether the DME is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual presentation for post-surgical recovery.

119.    It is extremely improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" and "2" – who underwent minimally invasive surgical procedures with a Referring Provider at a surgical center – would ultimately receive the same post-surgical treatment, including prescriptions for CTUs, CPMs, DVT Devices, and SAM Units despite being differently situated.

120.    A substantial number of Insureds receiving virtually identical post-operative prescriptions for CTUs, CPMs, DVT Devices, and SAM Units would, by extension, mean that all those Insureds had presentations for post-surgical recovery.

121.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated operative report issued by the Referring Provider, the report virtually always failed to identify the Fraudulent Equipment identified on the prescriptions provided to Defendants and used by Defendants to bill GEICO for the charges identified in Exhibits "1" and "2".

122.    In a legitimate setting, when a patient returns for a post-operative follow-up examination, the surgeon would inquire – and appropriately report – whether the previously prescribed DME aided the patient's recovery. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME, issue new DME, or discontinue the use of DME altogether.

123.    However, follow-up examination reports issued by Referring Providers, to the extent there were follow-up examinations, failed to include any information regarding the Fraudulent Equipment that was previously prescribed to the Insureds.

124.    Pursuant to the predetermined fraudulent protocols implemented by Defendants and others associated with the Clinics, Insureds were prescribed virtually identical Fraudulent Equipment, including prescriptions for CTUs, CPMs, DVT Devices, and SAM Units, without regard for the medical necessity of the Fraudulent Equipment, the Insureds' individual post-surgical presentation and ability for post-surgical recovery.

125.    In a legitimate setting, there are only a limited number of circumstances where CPMs are medically necessary to aid in a patient's recovery. A CPM is a machine that provides joint movement without active contraction of muscle groups, with the goal of increasing range of motion and promotion healing of joint surfaces. Circumstances where CPMs could be medically necessary include patient recovery after a total replacement of a patient's knee or shoulder, or surgery to repair an anterior cruciate ligament.

126.    Moreover, and again in a legitimate setting, CPMs are not provided when patients undergo minimally invasive surgical procedures such as an arthroscopic surgery and when the patients can undergo traditional physical therapy. This is due to: (i) the ability for physical therapy to provide long-term benefits when CPMs cannot; and (ii) regularly accepted medical studies that have concluded the use of CPMs in post-operative recovery do not provide short-term or long-term benefit.

127.    In support of the fact that CPMs purportedly issued to the Insureds are not medically necessary, an evidence-based study on rehabilitation after arthroscopic rotator cuff repair revealed that there is no significant difference in the outcome of patients who used CPMs for three to four weeks after surgery compared to those who did not use CPMs for the same period.

128.    In further support of the limit uses of CPMs, the Centers for Medicare and Medicaid Services issued a National Coverage Determination concluding that CPMs are only considered necessary after: (i) total knee arthroplasty; (ii) anterior cruciate ligament repair/reconstruction; (iii) during the non-weight-bearing period to promote healing after cartilage grafting procedures; and (iv) surgical release of arthrofibrosis of any joint.

129.    Consistent with limited uses of CPMs by the Centers for Medicare and Medicaid Even more, the American Academy of Orthopedic Surgeons ("AAOS") issued clinical practice

guidance that the use of CPMs in *total knee replacement surgery* does not improve outcomes. Even more, AAOS clinical practice guidelines for rotator cuff and anterior cruciate ligament repairs *do not even address* the use of CPMs as part of the rehabilitative process.

130.    Unlike the Insureds identified in Exhibit "1" who were issued prescriptions for CPMs after an arthroscopic procedure, patients who undergo serious knee or shoulder surgery may have some short-term benefits by using CPMs to aid in quicker range of motion recovery.

131.    To the extent that CPMs are medically appropriate, in a legitimate setting, CPMs will be prescribed for only a short-term period that is typically less than two weeks. Long term usage of CPMs – such as for up to six weeks – will not legitimately be prescribed as there is no evidence that the long-term use of CPMs provide any benefit to patients.

132.    Additionally, in a legitimate setting, a patient would need a specific medical co-morbidity necessitating the need for a CPM, and the co-morbidity would be documented pre-operatively to indicate the necessity of a CPM.

133.    It is improbable that a legitimate healthcare provider would issue a prescription for a CPM to a patient post-arthroscopic surgery – let alone for up to six weeks of use – when that patient is ambulatory, is able to undergo traditional physical therapy, and does not have a notated co-morbidity necessitating the need for a CPM.

134.    In keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" after surgery were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were typically prescribed CPMs by the Referring Providers for between four and six weeks at a time after arthroscopic surgeries when the Insureds were able to and did undergo a physical therapy program that was contemporaneously prescribed.

135.    Furthermore, and in keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as the surgical records routinely failed to identify or never explained the medical necessity of the prescriptions for CPMs that were used by Monac Supply to submit charges to GEICO.

136.    Even if the CPMs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the four-to-six-week rental periods for the CPMs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines, including the AAOS, which does not recommend them in the context prescribed to the Insureds identified in Exhibit "1".

137.    Similarly, the CTUs that were prescribed and issued to the Insureds identified in Exhibits "1" and "2", then routed to Monac Supply and Vue Supply, were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

138.    Where a patient is in a position to be able to place an ice-pack, there is little medically necessary reason to use a CTU. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CTU compared to an ice pack.

139.    Further, there is little evidence to support the use of cryotherapy – either in the form of an ice pack or a CTU – for post-operative patients to decrease swelling, including patients who undergo minimally invasive procedures such as the arthroscopic surgery performed on Insureds identified in Exhibits "1" and "2", beyond the initial 72 hours post-surgery.

140.    After the first 72 hours, cryotherapy benefits post-arthroscopic surgery patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cryotherapy is typically provided by the physical therapist in the form of ice packs.

141.    In keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibits "1" and "2" were not medically necessary, and were provided pursuant to predetermined fraudulent protocols, the Insureds identified in Exhibits "1" and "2" were virtually always prescribed the CTUs for weeks at a time or to keep indefinitely, when there was no objective evidence that the Insureds were unable to use an ice pack.

142.    Furthermore, and in keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibits "1" and "2" after surgery were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as the surgical records repeatedly failed to identify or failed to explain the medical necessity of the prescriptions for CTUs that were used by Defendants to submit charges to GEICO.

143.    Even if the CTUs that were prescribed to the Insureds identified in Exhibits "1" and "2" were medically appropriate, the length of use for the CTUs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines for post-operative care.

144.    The Insureds identified in Exhibits "1" and "2", were also purportedly provided with SAM Units from Monac Supply and Vue Supply, either to rent for weeks at a time or to keep indefinitely, which were not medically necessary.

145.    Both Monac Supply and Vue Supply purportedly provided SAM Units to Insureds which were purportedly a battery powered, wearable low intensity ultrasound device for home-use.

146.    However, the use of a SAM Unit does not comport with generally accepted medical guidelines for post-operative care of the arthroscopic surgery performed on the Insureds.

147.    In fact, commercial insurers do not provide reimbursement for SAM Units.  For example, Aetna states that it considers "hands-free" ultrasound and low frequency sound devices experimental and investigational because their clinical values have not been established.

148.    It is improbable that a legitimate physician would issue a prescription for a SAM Unit to a patient post-arthroscopic surgery when these devices are considered investigational in nature.

149.    Furthermore, and in keeping with the fact that the SAM Units prescribed to the Insureds identified in Exhibits "1" and "2" after surgery were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as the surgical records repeatedly failed to identify or failed to explain the medical necessity of the prescriptions for SAM Units that were used by Monac Supply and Vue Supply to submit charges to GEICO.

150.    Additionally, the DVT Devices purportedly issued to the Insureds identified in Exhibits "1" and "2" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol.

151.    A DVT Device is a machine that provides compression to the lower extremities to aid in the prevention of deep vein thrombosis, i.e. a blood clot in the vein. There are only a limited number of circumstances where DVT Devices are medically necessary to aid in a patient's recovery.

152.    DVT Devices can be medically necessary when: (i) a patient recovers from an in-patient surgical procedure where the patient has limited mobility or is otherwise immobile; (ii) a

patient has a specific documented preexisting ambulatory defect, such as Parkinson's Disease; or (iii) a patient has a documented reconstructive surgical procedure of the knee which would impact the patient's ability to ambulate post-surgery.

153.    Moreover, in a legitimate setting, DVT Devices are <u>not</u> ordered when patients undergo minimally invasive surgical procedures and are ambulatory post-surgery, such as the out-patient arthroscopic surgeries performed by the Referring Providers to the Insureds identified in Exhibit "1".

154.    Therefore, absent a documented pre-existing ambulatory defect, a DVT Device is never medically necessary following a shoulder arthroscopy, like the ones performed by the Referring Providers to many of the Insureds, as the procedure does not affect a patient's ability to ambulate.

155.    Similarly, absent a documented pre-existing ambulatory defect, a DVT Device is never medically necessary following a knee arthroscopy at an ambulatory surgical facility, like the ones performed by the Referring Providers to many of the Insureds.

156.    It is improbable – to the point of impossibility – that a legitimate healthcare provider would issue identical prescriptions for DVT Devices to multiple patients' post-arthroscopic surgery, when the patients are ambulatory and do not have a documented co-morbidity necessitating the need for a DVT Device.

157.    Despite the lack of medical necessity of the Fraudulent Equipment, Insureds were issued prescriptions for Fraudulent Equipment based on the predetermined treatment protocols established between Defendants, the John Doe Defendants, and others who are presently unknown in a recurring fashion in an effort to maximize the billing Defendants could submit to GEICO and other automobile insurers.

158.    As identified above, Defendants' scheme began with prescriptions for the rental of Fraudulent Equipment being routed to Monac Supply, then the scheme shifted and prescriptions for the sale of Fraudulent Equipment were routed to Vue Supply.

159.    For example:

(i)    On August 26, 2021, an Insured named SD was purportedly involved in a motor vehicle accident. On September 15, 2022, Drazic performed an arthroscopic procedure on SD's left knee at Global Surgery Center located in Kinderhook, New Jersey ("Global Surgery Center"). On September 19, 2022, Drazic purportedly issued prescriptions in the name of SD that were provided to **Monac Supply** for the 4-6 week rental of a CTU, a CPM for knee rental with the rental duration left blank, and the rental of a SAM Unit with the rental duration left blank, despite Drazic not treating or otherwise examining SD on that date.

(ii)    On January 30, 2022, an Insured named EC was purportedly involved in a motor vehicle accident. On September 10, 2022, Drazic performed an arthroscopic procedure on EC's right shoulder at Global Surgery Center. On September 12, 2022, Drazic purportedly issued prescriptions in the name of EC that were each provided to **Monac Supply** for the 4-6 week rental of a CTU, the 4-6 week rental of a CPM for the shoulder, and the rental of a SAM Unit with the rental duration left blank, despite Drazic not treating or otherwise examining EC on that date.

(iii)    On April 10, 2022, an Insured named DV was purportedly involved in a motor vehicle accident. On September 15, 2022, Sinha performed an arthroscopic procedure on DV's left shoulder at All City Family Healthcare Center located in Brooklyn, New York ("All City Healthcare"). Also on September 15, 2022, Sinha purportedly issued prescriptions in the name of DV that were each provided to **Monac Supply** for the 2-4 week rental of a CTU and the 2-4 week rental of a CPM for the knee.

(iv)    On June 17, 2022, an Insured named SF was purportedly involved in a motor vehicle accident. On September 22, 2022, Drazic performed an arthroscopic procedure on SF's right shoulder at Global Surgery Center. On September 23, 2022, Drazic purportedly issued prescriptions in the name of SF that were each provided to **Monac Supply** for the 4-6 week rental of a CTU, the 4-6 week rental of a CPM for the shoulder, and the rental of a SAM Unit with the rental duration left blank, despite Drazic not treating or otherwise examining SF on that date.

(v)    On July 5, 2022, an Insured named CT was purportedly involved in a motor vehicle accident. On September 15, 2022, Drazic performed an arthroscopic procedure on CT's left shoulder at Global Surgery Center. On September

19, 2022, Drazic purportedly issued prescriptions in the name of CT that were each provided to **Monac Supply** for the rental of a CTU with the rental duration left blank, the rental of a CPM for the shoulder with the rental duration left blank, and the rental of a SAM Unit with the rental duration left blank, despite Drazic not treating or otherwise examining CT on that date.

(vi)     On July 27, 2022, an Insured named JDLS was purportedly involved in a motor vehicle accident. On September 22, 2022, Drazic performed an arthroscopic procedure on JDLS's right knee at Global Surgery Center. On September 23, 2022, Drazic purportedly issued prescriptions in the name of JDLS that were each provided to **Monac Supply** for the 4-6 week rental of a CTU, the 4-6 week rental of a CPM for the knee, and the rental of a SAM Unit with the rental duration left blank, despite Drazic not treating or otherwise examining JDLS on that date.

(vii)    On July 30, 2022, an Insured named AL was purportedly involved in a motor vehicle accident. On September 15, 2022, Drazic performed an arthroscopic procedure on AL's left shoulder at Global Surgery Center. On September 19, 2022, Drazic purportedly issued prescriptions in the name of AL that were each provided to **Monac Supply** for the 4-6 week rental of a CTU, the rental of a CPM for the shoulder with the rental duration left blank, and the rental of a SAM Unit with the rental duration left blank, despite Drazic not treating or otherwise examining AL on that date.

(viii)   On August 17, 2022, an Insured named JC was purportedly involved in a motor vehicle accident. On November 3, 2022, Sinha performed an arthroscopic procedure on JC's right knee at All City Healthcare. Also on November 3, 2022, Sinha purportedly issued prescriptions in the name of JC that were each provided to **Monac Supply** for the 2 week rental of a DVT Device and the 2-4 week rental of a CPM for the knee.

(ix)     On August 19, 2022, an Insured named DB was purportedly involved in a motor vehicle accident. On November 17, 2022, Sinha performed an arthroscopic procedure on DB's right shoulder at All City Healthcare. Also on November 17, 2022, Sinha purportedly issued prescriptions in the name of DB that were each provided to **Monac Supply** for the 2-4 week rental of a CTU and the 2-4 week rental of a CPM for the shoulder.

(x)      On August 28, 2022, an Insured named AJ was purportedly involved in a motor vehicle accident. On October 27, 2022, Sinha performed an arthroscopic procedure on AJ's right knee at CitiMed Surgery Center located in Jamaica, New York ("Citimed"). Also on October 27, 2022, Sinha purportedly issued prescriptions in the name of AJ that were each provided to **Monac Supply** for the 2 week rental of a DVT Device and the 2-4 week rental of a CPM for the knee.

(xi)    On October 31, 2022, an Insured named CG was purportedly involved in a motor vehicle accident. On April 14, 2023, Drazic performed an arthroscopic procedure on CG's left shoulder at East Tremont Ambulatory Surgery Center ("East Tremont ASC") located in Bronx, New York. On April 17, 2023, Drazic purportedly issued prescriptions in the name of CG that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining CG on that date.

(xii)    On January 18, 2023, an Insured named MM was purportedly involved in a motor vehicle accident. On April 21, 2023, Drazic performed an arthroscopic procedure on MM's right shoulder at East Tremont ASC. On April 24, 2023, Drazic purportedly issued prescriptions in the name of MM that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining MM on that date.

(xiii)    On January 24, 2023, an Insured named MS was purportedly involved in a motor vehicle accident. On April 20, 2023, Drazic performed an arthroscopic procedure on MS's right shoulder at East Tremont ASC. On April 24, 2023, Drazic purportedly issued prescriptions in the name of MS that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining MS on that date.

(xiv)    On February 15, 2023, an Insured named ML was purportedly involved in a motor vehicle accident. On April 14, 2023, Drazic performed an arthroscopic procedure on ML's left shoulder at East Tremont ASC. On April 17, 2023, Drazic purportedly issued prescriptions in the name of ML that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining ML on that date.

(xv)    On February 15, 2023, an Insured named JE was purportedly involved in a motor vehicle accident. On April 21, 2023, Drazic performed an arthroscopic procedure on JE's left shoulder at East Tremont ASC. On April 24, 2023, Drazic purportedly issued prescriptions in the name of JE that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining JE on that date.

(xvi)    On February 21, 2023, an Insured named TW was purportedly involved in a motor vehicle accident. On April 28, 2023, Drazic performed an arthroscopic procedure on TW's right shoulder at East Tremont ASC. On May 1, 2023, Drazic purportedly issued prescriptions in the name of TW that were each provided to **Vue Supply**, for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining TW on that date.

(xvii)    On February 26, 2023, an Insured named GD was purportedly involved in a motor vehicle accident. On May 5, 2023, Drazic performed an arthroscopic procedure on GD's left shoulder at East Tremont ASC. On May 8, 2023, Drazic purportedly issued prescriptions in the name of GD

that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining GW on that date.

(xviii)   On March 8, 2023, an Insured named YM was purportedly involved in a motor vehicle accident. On April 20, 2023, Drazic performed an arthroscopic procedure on YM's right shoulder at East Tremont ASC. On April 21, 2023, Drazic purportedly issued prescriptions in the name of YM that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining YM on that date.

(xix)   On March 8, 2023, an Insured named LH was purportedly involved in a motor vehicle accident. On May 12, 2023, Drazic performed an arthroscopic procedure on LH's left shoulder at East Tremont ASC. On May 15, 2023, Drazic purportedly issued prescriptions in the name of LH that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining LH on that date.

(xx)   On March 13, 2023, an Insured named RR was purportedly involved in a motor vehicle accident. On May 19, 2023, Drazic performed an arthroscopic procedure on RR's right shoulder at East Tremont ASC. On May 22, 2023, Drazic purportedly issued prescriptions in the name of RR that were each provided to **Vue Supply** for a CTU and a SAM Unit, despite Drazic not treating or otherwise examining RR on that date.

160.   These are only representative examples.  In fact, all the Insureds identified in Exhibits "1" and "2" that received prescriptions Fraudulent Equipment after a surgical procedure received prescriptions for Fraudulent Equipment virtually identical to the ones identified above pursuant to predetermined fraudulent protocols with others who are not presently identifiable.

161.   In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" and "2" were part of predetermined fraudulent protocol – and not based upon medical necessity – virtually all prescriptions used to support the charges identified in Exhibits "1" and "2" that were purportedly issued by Drazic and Sinha were duplicated forms with Drazic and Sinha's signatures photocopied with the prescription, with the names of the Insureds and date changed from prescription to prescription, as identified above.

162.   Further, Vue Supply only received prescriptions from a single Referring Provider - Drazic -  for the entirety of their billing to GEICO contained in Exhibit "2".

163.    The Defendants knew that these prescriptions from the Referring Providers were based upon photocopies yet used these prescriptions as the basis to support the fraudulent charges identified in Exhibits "1" and "2" anyway, solely for their own financial enrichment.

164.    In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" and "2" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

165.    Instead, the prescriptions were routed directly to Defendants by unknown individuals associated to avoid the possibility that an Insured would bring the prescriptions to a legitimate DME retailer outside of the scheme.

166.    For the reasons set forth above, all of the charges for Fraudulent Equipment identified in Exhibits "1" and "2" were not medically necessary and were provided as part of predetermined fraudulent protocols.

ii.    **The Predetermined Prescription Protocol Involving BandB Supply and Westend Supply**

167.    Virtually all of the Insureds identified in Exhibits "3" and "4" sustained soft tissue injuries, such as sprains and strains, as a result of their underlying motor vehicle accident.

168.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain of this type should begin with well-established conservative therapies such as short-term bed rest, rehabilitative exercises, physical therapy, and over-the-counter non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

169.    If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment and the use of other well-studied medications.  These clinical approaches are well-established.

170.    In fact, the Insureds were virtually always directed to a course of supervised in-office conservative care, including physical therapy, chiropractic treatments, and pain medications, that was sufficient to treat the Insured's soft tissue injuries without the prescription and rental of a device not sufficiently proved to be effective.

171.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms or presentation and assess whether that course of treatment was working before prescribing DME, like an LLLT Device, PEMF Device, CTU, PCT Device, and/or an Osteo Stim Device, which have not been proven sufficiently effective in the contexts in which they were purportedly prescribed to the Insureds identified in Exhibits "3" and "4".

172.    Also in a legitimate setting, during the course of a patient's treatment, the provider may – but not always – provide DME that would aid in the treatment of the patient's symptoms. There are numerous types of DME available and the specific type of DME that would be prescribed, along with the time period for its use to aid the treatment of the patient, should always directly relate to the patients' individual symptoms and presentation.

173.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

174.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

175.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

176.    If a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed, why it was medically necessary, or how it would help the Insureds.

177.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

178.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "3" and "4" who treated with at the Clinics would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

179.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "3" and "4" who treated with different Referring Providers at different Clinics would receive virtually identical prescriptions for numerous items of Fraudulent

Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

180.    In also keeping with the fact that the prescriptions for Fraudulent Equipment used by the BandB Supply and Westend Supply were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued by the Referring Providers on dates that the Insureds never even treated with the Referring Providers.

181.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to Defendants and used by Defendants to bill GEICO for the charges identified in Exhibits "3" and "4".

182.    To the extent that Insureds returned to treat with the Referring Provider for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

183.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

184. However, the follow-up examination reports from Referring Providers for the Insureds identified in Exhibits "3" and "4" failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

185. Additionally, the vast majority of prescriptions identified in Exhibits "3" and "4" were not actually issued by the Referring Provider listed on the prescription. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

186. For example, as identified above and also in support of the fact that the prescriptions for Fraudulent Equipment used by Defendants to support the charges identified in Exhibits "3" and "4" were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions that were purportedly issued by Referring Providers contained a photocopied signature the Referring Providers.

187. In keeping with the fact that the Fraudulent Equipment was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols – and not prescribed based on each patient's individual symptoms or presentation – the Referring Providers issued prescriptions for LLLT Devices to Insureds to for pain relief as a matter of course.

188. This is despite the fact that LLLT devices are considered investigational and experimental in the medical industry and have not been proven effective for treating the types of injuries sustained by Insureds involved in "fender-bender" type automobile accidents.

189. Indeed, the United States Food and Drug Administration has not issued any conclusions about the effectiveness of LLLT because of a paucity of comprehensive, large-scale clinical studies.

190.    Further, except under very specific circumstances involving the prevention of oral mucositis in an individual undergoing certain cancer treatment, commercial insurers do not deem LLLT devices as medically necessary, nor do they provide reimbursement for LLLT devices. For example, Aetna cites inadequate evidence showing an LLLT device's effectiveness for the types of minor musculoskeletal injuries and symptoms typically experienced by Insureds involved in minor automobile accidents.

191.    However, despite a lack of medical utility for the LLLT Devices, Defendants received prescriptions purportedly issued by the Referring Providers for LLLT Devices without regard to genuine patient care and solely to maximize profits and allow BandB Supply and Westend Supply to charge GEICO $2,200.00 under HCPCS Code E1399 for purportedly delivering these devices to Insureds.

192.    Similarly, the Referring Providers purportedly issued repeated prescriptions to Insureds for PEMF and Osteo Stim Devices despite virtually none of the Insureds demonstrating any reason that justified the use of a PEMF or Osteo Stim Device

193.    PEMF Devices use pulsed electromagnetic stimulation to provide pain relief.  There is no legitimate body of evidence that establishes the effectiveness of PEMF Devices for the treatment of acute spinal injuries or shoulder pain.  In fact, various commercial insurers have issued policy bulletins that make clear that pulsed electromagnetic stimulation is experimental and investigational.

194.    Notwithstanding the experimental and investigational nature of Pulsed Electromagnetic Field therapy, Defendants received prescriptions purportedly issued by the Referring Providers for the expensive PEMF Devices solely to maximize profits without regard to

genuine patient care and to allow BandB Supply and Westend Supply to charge GEICO $4,766.24 under HCPCS Code E1399 for purportedly delivering these devices to Insureds.

195.    Osteo Stim Devices are used to encourage bone growth and accelerate fracture healing.  CMS has published guidance making clear that the devices are medically necessary only in limited instances involving bone fractures.  In particular, CMS states as follows:

> A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:
>
> 1.  Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator; or
> 2.  Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery; or
> 3.  Congenital pseudarthrosis.
>
> Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.
>
> A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

196.    In keeping with the fact that the Insureds who were prescribed Osteo Stim Devices had no reason to be prescribed an Osteo Stim Device, virtually all of the Insureds who received prescriptions for an Osteo Stim Device were not diagnosed with a fracture.

197.    The prescriptions for Osteo Stim Devices were solely designed to allow BandB Supply and Westend Supply to charge GEICO $3,300.00 under HCPCS Code E0747 for purportedly delivering these devices to Insureds.

198.    Further, the CTUs and PCT Devices that were purportedly prescribed by Referring Providers and issued to the Insureds identified in Exhibits "3" and "4" were not medically

necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

199.    When a patient suffers from sprains and strains as part of a minor automobile accident, such as the Insureds identified in Exhibits "3" and "4", the patient's sprains and strains will virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, which include using ice-packs and placing an elastic bandage to provide compression.

200.    PCT Devices use high pressure in a rapid inflation and deflation cycle to assist patients with arterial insufficiency and improve their blood circulation.

201.    There are limited circumstances where a patient would require a PCT Device of the type prescribed by the Referring Providers and used by BandB Supply and Westend Supply to bill GEICO, which would be documented in a contemporaneous medical record.

202.    However, none of the Insureds who were purportedly issued prescriptions for PCT Devices by Referring Providers had any notation regarding an arterial insufficiency in their medical records, and the devices were instead prescribed pursuant to the predetermined protocols established by Defendants and others to allow BandB Supply and Westend Supply to bill GEICO $2,826.70 under HCPCS Code E0675 for delivering these devices to Insureds.

203.    Additionally, there is little medically necessary reason to use a CTU where a patient is in a position to be able to place an ice-pack. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CTU compared to an ice pack.

204.    In keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibits "3" and "4" were not medically necessary, and were provided pursuant to predetermined

fraudulent protocols, the Insureds identified in Exhibits "3" and "4" were virtually always prescribed the CTUs to keep indefinitely, when there was no objective evidence that the Insureds were unable to use an ice pack.

205.    The CTUs were instead prescribed pursuant to the predetermined protocols established by Defendants and others to allow BandB Supply and Westend Supply to charge GEICO $1,650.00 under HCPCS Code E1399 for delivering these devices to Insureds.

206.    To illustrate Defendants' scheme, Insureds who treated at Clinics located at 788 Southern Blvd., Bronx, New York (the "Southern Blvd. Clinic") and 1877 Webster Ave., Bronx, New York (the "Webster Ave. Clinic") were subjected to virtually identical treatment protocols.

207.    Virtually every Insured identified in Exhibits "3" and "4" who purportedly received treatment at the Southern Blvd. or Webster Ave. Clinics was provided with an initial examination from a healthcare provider, including Leon and Jagga. After their purported initial examination, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

208.    The Referring Providers did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME to provide.

209.    Rather, prescriptions for a predetermined set of Fraudulent Equipment were issued to each Insured after a purported initial examination or on dates the Referring Provider never even treated with the Insured based upon the predetermined fraudulent protocol established between Defendants, John Doe Defendants, and Referring Providers.

210.    Virtually every Insured who received treatment at the Southern Blvd. and Webster Ave. Clinics received prescriptions for virtually the same type of Fraudulent Equipment.

211.    Further, and as identified above, the prescriptions purportedly issued by Leon and Jagga contained photocopied signatures, with the name of the Insured and date changed from prescription to prescription.

212.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, Insureds were virtually always prescribed the following Fraudulent Equipment on the same date: (i) a LLLT Device; (ii) a PEMF Device; (iii) a CTU; (iv) a PCT Device; and (v) an Osteo Stim Device.

213.    The prescriptions for the LLLT Devices, PEMF Devices, and CTUs were routed to Westend Supply while the prescriptions for the PCT Devices and Osteo Stim Devices were routed to BandB Supply.

214.    The prescriptions were routed to Westend Supply and BandB Supply in the manner as part of the scheme between Defendants and the John Doe Defendants to provide Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in an effort to artificially lower the total amount billed to GEICO by any one company so Defendants could avoid detection of their fraudulent scheme.

215.    For example:

(i)     On January 19, 2024, an Insured named YL was purportedly involved in a motor vehicle accident. YL began treating at the Webster Ave. Clinic with Jagga on or about April 24, 2024. On June 6, 2024, despite not treating or otherwise examining YL on that date, Jagga purportedly issued five prescriptions in the name of YL, for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(ii)    On January 19, 2024, an Insured named YM was purportedly involved in a motor vehicle accident. YM began treating at the Webster Ave. Clinic with Jagga on or about April 25, 2024. On June 6, 2024, despite not treating or otherwise examining YM on that date, Jagga purportedly issued five prescriptions in the name of YM for: (i) a LLLT Device, a PEMF Device,

and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(iii)    On February 17, 2024, an Insured named JA was purportedly involved in a motor vehicle accident. JA began treating at the Webster Ave. Clinic with Jagga on or about April 18, 2024. On June 6, 2024, despite not treating or otherwise examining JA on that date, Jagga purportedly issued five prescriptions in the name of JA for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(iv)    On February 17, 2024, an Insured named DR was purportedly involved in a motor vehicle accident. DR began treating at the Webster Ave. Clinic with Jagga on or about April 18, 2024. On June 6, 2024, despite not treating or otherwise examining DR on that date, Jagga purportedly issued five prescriptions in the name of DR for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(v)    On April 22, 2024, an Insured named DV was purportedly involved in a motor vehicle accident. DV began treating at the Southern Blvd. Clinic with Leon on or about May 6, 2024. Also on May 6, 2024, Leon purportedly issued five prescriptions in the name of DV for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(vi)    On April 23, 2024, an Insured named CR was purportedly involved in a motor vehicle accident. CR began treating at the Southern Blvd. Clinic with Leon on or about May 6, 2024. Also on May 6, 2024, Leon purportedly issued five prescriptions in the name of CR for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(vii)    On April 24, 2024, an Insured named YN was purportedly involved in a motor vehicle accident. YN began treating at the Southern Blvd. Clinic with Leon on or about May 20, 2024. Also on May 20, 2024, Leon purportedly issued five prescriptions in the name of YN for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(viii)    On April 24, 2024, an Insured named JP was purportedly involved in a motor vehicle accident. JP began treating at the Southern Blvd. Clinic with Leon on or about May 20, 2024. Also on May 20, 2024, Leon purportedly issued five prescriptions in the name of JP for: (i) a LLLT Device, a PEMF

Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(ix)    On June 21, 2024, an Insured named AB was purportedly involved in a motor vehicle accident. AB began treating at the Webster Ave. Clinic with Jagga on or about June 25, 2024. On July 7, 2024, despite not treating or otherwise examining AB on that date, Jagga purportedly issued five prescriptions in the name of AB for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

(x)    On June 23, 2024, an Insured named AC was purportedly involved in a motor vehicle accident. AC began treating at the Webster Ave. Clinic with Jagga on or about July 2, 2024. On July 11, 2024, despite not treating or otherwise examining AC on that date, Jagga purportedly issued five prescriptions in the name of AC for: (i) a LLLT Device, a PEMF Device, and a CTU, which were provided to **Westend Supply**; and (ii) a PCT Device and an Osteo Stim Device, which were provided to **BandB Supply**.

216.    These are only representative samples.  In fact, all the Insureds identified in Exhibits "3" and "4" that received prescriptions Fraudulent Equipment after treating at a Clinic received prescriptions for Fraudulent Equipment virtually identical to the ones identified above pursuant to predetermined fraudulent protocols between Defendants and others who are not presently identifiable.

217.    In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "3" and "4" were part of predetermined fraudulent protocol – and not based upon medical necessity – virtually all prescriptions used to support the charges identified in Exhibits "3" and "4" that were purportedly issued by Leon and Jagga were duplicated forms with Leon and Jagga's signatures photocopied with the prescription, with the names of the Insureds and date changed from prescription to prescription, as identified above.

218.    The Defendants knew that these prescriptions from the Referring Providers were based upon photocopies yet used these prescriptions as the basis to support the fraudulent charges identified in Exhibits "3" and "4" anyway, solely for their own financial enrichment.

219.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "3" and "4" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

220.    Instead, the prescriptions were routed directly to BandB Supply and Westend Supply from the Clinics to avoid the possibility that an Insured would bring the prescriptions to a legitimate DME retailer outside of the scheme.

221.    For the reasons set forth above, all of the charges for Fraudulent Equipment identified in Exhibits "3" and "4" were not medically necessary and were provided as part of predetermined fraudulent protocols.

### E.    The Unlawful Distribution of Fraudulent Equipment to Insureds Without Valid Prescriptions

222.    The DME Entities are not licensed medical professional corporations and Bobkov is not a licensed healthcare provider. As such, Defendants were not lawfully permitted to prescribe DME to Insureds. For the same reason, Defendants cannot properly dispense DME to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME to be provided.

223.    However, in many of the fraudulent claims identified in Exhibits "1" through "4" Defendants improperly decided what DME to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME to the Insureds.

224.    For example, in many of the prescriptions for SAM Units that Monac Supply used to support the charges identified in Exhibit "1", the Referring Provider did not indicate a length of the rental.

225.    Similarly, in many of the prescriptions for CPMs and CTUs that Monac Supply used to support the charges identified in Exhibit "1", the Referring Provider indicated a ranged length of rental (i.e. four-to-six weeks).

226.    In a legitimate setting, prescriptions – including prescriptions for DME and pharmaceuticals - are supposed to include instructions for the patients describing: (i) what the patient is supposed to do; (ii) how often the patient should do it; and (iii) how long the patient should keep doing it.

227.    However, the prescriptions purportedly issued by the Referring Providers, and which Monac Supply used to support many of the charges identified in Exhibit "1", failed to contain a certain time period for how long the Fraudulent Equipment should be rented to Insureds.

228.    Even though many of the prescriptions for SAM Units did not specify a length of time for how long the SAM Unit should rented each Insured, Monac Supply routinely provided Insureds with a 40-day rental for the SAM Unit.

229.    Additionally, the prescriptions for CTUs or CPMs that included a ranged length of rental (i.e. four-to-six weeks), Monac Supply routinely provided the Fraudulent Equipment to Insureds for the longer date range.

230.    As unlicensed healthcare providers, Defendants did not have the ability to determine the medically necessary length of time that each Insured should be provided with Fraudulent Equipment.

231.    In a legitimate clinical setting, when a DME supplier would receive a prescription from a licensed healthcare provider for a rental item that does not include a predetermined time period, the DME supplier would contact the referring healthcare provider to request clarification on the rental period for the prescribed item.

232.    However, Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as how long the Fraudulent Equipment should be provided to each Insured.

233.    Additionally, many of the prescriptions purportedly issued by the Referring Providers and supplied to Defendants failed to provide any instruction to the Insureds regarding how often they were supposed to use the Fraudulent Equipment.

234.    In virtually all of the claims identified in Exhibit "1", Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME issued by healthcare providers. Instead, Defendants purportedly provided the Fraudulent Equipment based upon their own determination of how long the Fraudulent Equipment should be rented to the Insureds, and, thus, were not eligible for reimbursement of No-Fault Benefits.

### F.    The Defendants' Fraudulent Billing

235.    In addition to the fraudulent schemes to submit bills for prescriptions that were based upon unlawful financial arrangements, prescriptions that were never actually issued by the Referring Provider indicated on the prescription, illegally duplicated, and medically unnecessary prescriptions that were based upon predetermined fraudulent protocols, the bills submitted to GEICO by Defendants misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Fraudulent Equipment were for permissible reimbursement rates, when they were not.

236.    Further, Defendants knowingly misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the

prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between Defendants and others who are not presently identifiable.

237.    In the bills and other documents submitted to GEICO, Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between Defendants and others who are presently unidentifiable.

238.    In addition, in every bill that Defendants submitted to GEICO, Defendants would misrepresent the reimbursement amount that they were entitled to obtain under the No-Fault Laws for the Fraudulent Equipment purported to Insureds.

239.    For example, Defendants would frequently submit bills seeking significantly higher reimbursement amounts than what was permitted under the Fee Schedule, such as when:

>   (i)    Monac Supply submitted bills to GEICO for the rental of shoulder CPMs under HCPCS Code E0936 at a rate of $109.99 per day when the Fee Schedule set the maximum *weekly* rental rate at $218.33, or only $31.19 per day;
>
>   (ii)   Monac Supply submitted bills to GEICO for the rental of knee CPMs under HCPCS Code E0935 at a rate of $99.99 per day when the Fee Schedule set the maximum *weekly* rental rate at $132.16, or only $18.88 per day;
>
>   (iii)  Monac Supply submitted bills to GEICO for the rental of CTUs at a rate of $95.00 per day under the "miscellaneous" HCPCS Code E1399, when CTUs are not "miscellaneous" items to be billed under HCPCS Code E1399 but are instead qualified under HCPCS Code E0218 with the Fee Scheduling setting the maximum *weekly* rental rate of $5.48.

240.    In addition to misrepresenting the permitted reimbursement rate, Defendants, mainly through BandB Supply and Westend Supply, misrepresented what was purportedly provided to Insureds in order to grossly increase the amount of No-Fault Benefits that they could obtain from GEICO and other automobile insurers.

241.    When Defendants submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

242.    By submitting bills to GEICO containing specific HCPCS Codes, Defendants represented that the Fraudulent Equipment purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

243.    However, the bills submitted to GEICO, including the ones by BandB Supply and Westend Supply, fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

244.    For example, each of the claims identified in Exhibits "3" and "4" for HCPCS Code E0747 fraudulently misrepresented that Defendants provided Insureds with Osteo Stim Devices and sought reimbursement from GEICO of $3,300.00 per unit.

245.    In reality – to the extent that any item was provided to Insureds – Defendants provided DME that were not Osteo Stim Devices, did not comport with the requirements of E0747, and were cheap and poorly made items that were not reimbursable at $3,300.00 per unit.

246.    As another example, each of the claims identified in Exhibits "3" and "4" for HCPCS Code E0675 fraudulently misrepresented that Defendants provided Insureds with a PCT Device and sought reimbursement from GEICO of $2,826.70 per unit.

247.    Similarly, to the extent that any item was provided to Insureds, Defendants provided DME that were not high-pressure PCT Devices, did not comport with the requirements of E0675, and were cheap and poorly made items that were not reimbursable at $2,826.70 per unit.

248.    Another part of Defendants scheme to fraudulently inflate the amount of No-Fault Benefits they could obtain included abusing the reimbursement for rental and sale DME billed under the "miscellaneous" HCPCS Code E1399 that does not contain a fee schedule rate.

249.    When submitting billing under HCPCS Code E1399, Defendants were required to submit documentation supporting their charges to GEICO to verify the rate charged to GEICO and other automobile insurers.

250.    However, Defendants, generally, did not submit documentation to substantiate their charges billed under HCPCS Code E1399.

251.    The only time Defendants purported to submit documentation to substantiate their exorbitant charges was through Westend Supply's submission of false and fabricated "invoices" purportedly issued by Top Notch Wholesale.

252.    Westend Supply submitted the fabricated Top Notch Wholesale invoices to mask Defendants fraudulent scheme because a legitimate invoice would reveal the actual reimbursement rates to be far less than the amounts fraudulently claimed by Westend Supply.

253.    Through their fraudulently inflating the reimbursement rate under HCPCS Code E1399, Defendants, through Monac Supply, submitted bills to GEICO for purportedly renting SAM Units to Insureds fraudulently misrepresented that they were able to collect $89.99 per day for each SAM Unit rented to an Insured when – in reality – the maximum reimbursement rate was only a fraction of what was charged to GEICO, to the extent that such an item was even provided.

254.    Upon information and belief, Defendants never submitted any documentation to substantiate their charges for SAM Units billed under HCPCS Code E1399 because there was no documentation that could support the daily rental rates charged by Defendants for SAM Unit rentals billed under HCPCS Code E1399.

255.    The Defendants also fraudulently inflating their billing under HCPCS Code E1399, through Vue Supply, when, in response to receiving prescriptions for a CTU and SAM Unit, Vue Supply would submit the following billing to GEICO for the same date of service:

| Bill No. | HCPCS Code | Description | Charge to GEICO |
|---|---|---|---|
| 1 | E1399 | Cold & compression therapy unit | $1799.99 |
| 2 | E1399 | Compression hose w wiring adapter | $1799.99 |
| 3 | E1399 | Shoulder wrap | $884.99 |
| 4 | E1399 | Ultrasound therapy device | $1988.99 |
| 5 | E1399 | Ultrasound therapy wiring w battery | $1798.50 |
| 6 | E1399 | Ultrasound patches | $349.99 |

256.    Upon information and belief, Defendants never submitted any documentation to substantiate their charges for above-referenced items because there was no documentation that could support the charges from Vue Supply billed under HCPCS Code E1399.

257.    Also as part of the scheme, and in an effort to artificially lower the amount billed to GEICO and mask Vue Supply's fraudulent billing, Defendants divided their billing to GEICO by as many as six separate bills for the same date of service.

258.    Similarly, the billing submitted by BandB Supply and Westend Supply also fraudulently misrepresented the permissible reimbursement amounts for the "miscellaneous" HCPCS Code E1399, as Defendants billed GEICO for:

| HCPCS Code | Description | Charge to GEICO |
|---|---|---|
| E1399 | Cold compression therapy system | $1,650.00 (BandB Supply and Westend Supply) |
| E1399 | LLLT Device | $1,800.00 (BandB Supply) $2,200.00 (Westend Supply) |

| E1399 | PEMF Device | $4,766.24 |
| E1399 | Back wrap | $375.00 |
| E1399 | Cervical spine wrap | $375.00 |
| E1399 | Shoulder wrap | $300.00 |
| E1399 | Knee wrap | $300.00 |
| E1399 | Elbow wrap | $225.00 |

259.    Aside from the fabricated invoices from Top Notch Wholesale, Defendants never submitted any real documentation to substantiate their charges for above-referenced items because there was no documentation that could support the charges from BandB Supply and Westend Supply.

260.    In each of the claims identified within Exhibits "1" – "4", Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for HCPCS Code E1399 were for permissible reimbursement amounts when they were not.

261.    Accordingly, in each of the claims within Exhibits "1" - "4", to the extent that any Fraudulent Equipment was actually provided, Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and were therefore not eligible to collect No-Fault Benefits in the first instance.

**III.    <u>The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO</u>**

262.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names of the DME Entities, seeking payment for Fraudulent Equipment.

263.    The NF-3 forms or HCFA-1500 forms that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they either never obtained a Dealer in Products License or, in the case of Vue Supply, falsified the information contained in their application for a Dealer for Products License.

(ii)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iii)   The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO the proper reimbursement amount for Fraudulent Equipment provided to the Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent any Fraudulent Equipment was provided – the bills falsified that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for the Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(v)     The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the

Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

264.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

265.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, Defendants have gone to great lengths to systematically conceal their fraud.

266.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Entities to obtain a Dealer in Products License from the DCWP because (i) Monac Supply, BandB Supply, and Westend Supply never obtained Dealer in Products Licenses and (ii) Bobkov falsely indicated, under penalty for false statements, in the application for Vue Supply's Dealer in Products License, the business address of Vue Supply. The Defendants concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

267.    Also, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were not based upon medical necessity but rather were based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided directly to the DME Entities without the involvement of Insureds, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

268.    Additionally, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

269.    Furthermore, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME, and not by an actual healthcare provider's prescription for medically necessary DME, in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

270.    Even more, Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

271.    Lastly, Defendants knowingly misrepresented the permissible reimbursement amount of the Fraudulent Equipment contained in the bills submitted by the DME Entities to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

272.    The billing and supporting documentation submitted by the DME Entities, when viewed in isolation, did not reveal its fraudulent nature.

273.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

274.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for verification with respect to all of the pending claims for No-Fault Benefits submitted through Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

275.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers. The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

276.    In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that DME Defendants have been engaged in fraud.

277.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent

litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $357,000.00 based upon the fraudulent charges.

278.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the Monac Supply, Vue Supply, BandB Supply, and Westend Supply**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

279.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

280.    There is an actual case in controversy between GEICO and the DME Entities regarding more than $2.2 million in fraudulent billing that has been submitted to GEICO in the name of the DME Entities.

281.    The DME Entities have no right to receive payment for any pending billing because Defendants did not comply with all local licensing laws as (i) Monac Supply, BandB Supply, and Westend Supply never obtained Dealer in Products Licenses and (ii) Bobkov falsified the business address for Vue Supplies on the application for a Dealer in Products License to induce the DCWP to issue a license, and thus, was not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

282.    The DME Entities also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted, pursuant to predetermined protocols designed solely to financially enrich Defendants, rather than to treat the Insureds.

283.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because Defendants provided Fraudulent Equipment as a result of its participation in unlawful financial arrangements.

284.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because Defendants purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

285.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Entities actually provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

286.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Entities provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented that the charges for the Fraudulent Equipment contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amounts.

287.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the DME Entities have no right to receive payment for any pending bills submitted to GEICO under the name of Monac Supply, BandB Supply, Vue Supply, and Westend Supply.

### SECOND CAUSE OF ACTION
**Against Bobkov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

288.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

289.    Monac Supply, Vue Supply, BandB Supply, and Westend Supply together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

290.    The DME Provider Enterprise includes the DME Entities that are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Monac Supply, Vue Supply, BandB Supply, and Westend Supply are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

291.    The DME Provider Enterprise operated under four separate names and tax identification numbers in order to limit the time period, type of Fraudulent Equipment, and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

292.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e.,

the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

293.    Bobkov has been employed by and/or associated with the DME Provider Enterprise.

294.    Bobkov knowingly has conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) in every claim, that the DME Entities had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Monac Supply, BandB Supply, and Westend Supply never obtained a Dealer in Products License and Vue Supply was not lawfully licensed as Bobkov knowingly falsified information on their application for a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that

any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Fraudulent Equipment was less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "4".

295.    The DME Provider Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Bobkov operated the DME Entities, inasmuch as the DME Entities never operated as legitimate DME providers, never were eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Entities to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Entities to the present day.

296.    The DME Provider Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers.  The no-fault collection lawsuits and/or arbitrations are brought piecemeal in an effort obfuscate GEICO and other insurer's discovery of their fraudulent scheme, to monetize the fraud and further perpetuate the RICO enterprise.  These inherently unlawful acts are taken by the DME Provider Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

297.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $357,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Provider Enterprise

298.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

### THIRD CAUSE OF ACTION
**Against Bobkov and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

299.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

300.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

301.    Bobkov and the John Doe Defendants are employed by and/or associated with the DME Provider Enterprise.

302.    Bobkov and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) in every claim, that the DME Entities had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Monac Supply, BandB Supply, and Westend Supply never obtained a Dealer in Products License and Vue Supply was not lawfully licensed as Bobkov knowingly falsified information on their application for a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Fraudulent Equipment was less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings

submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "4".

303.    Bobkov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

304.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $357,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Provider Enterprise.

305.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Monac Supply and Bobkov**
**(Common Law Fraud)**

306.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

307.    Monac Supply and Bobkov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Equipment.

308.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Monac Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Monac Supply was not lawfully licensed as they failed to obtain a Dealer in Products License; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to

financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Fraudulent Equipment was less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

309. Monac Supply and Bobkov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Monac Supply that were not compensable under New York no-fault insurance laws.

310. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted by Monac Supply and Bobkov.

311. Monac Supply and Bobkov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

312. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
### Against Monac Supply and Bobkov
### (Unjust Enrichment)

313. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

314. As set forth above, Monac Supply and Bobkov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

315. When GEICO paid the bills and charges submitted by or on behalf of Monac Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

316. Monac Supply and Bobkov have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Monac Supply and Bobkov voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

317. Monac Supply and Bobkov's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

318. By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $57,000.00.

### SIXTH CAUSE OF ACTION
### Against Vue Supply and Bobkov
### (Common Law Fraud)

319.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

320.    Vue Supply and Bobkov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Equipment.

321.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Vue Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Vue Supply was not lawfully licensed as they knowingly falsified the business address on their application for a Dealer in Products License; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Fraudulent Equipment was less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated

and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

322.    Vue Supply and Bobkov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Vue Supply that were not compensable under New York no-fault insurance laws.

323.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $39,000.00 pursuant to the fraudulent bills submitted by Vue Supply and Bobkov.

324.    Vue Supply and Bobkov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

325.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Vue Supply and Bobkov**
**(Unjust Enrichment)**

326.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

327.    As set forth above, Vue Supply and Bobkov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

328.    When GEICO paid the bills and charges submitted by or on behalf of Vue Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

329.    Vue Supply and Bobkov have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vue Supply and Bobkov voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

330.    Vue Supply and Bobkov's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

331.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $39,000.00.

**EIGHTH CAUSE OF ACTION**
**Against BandB Supply and Bobkov**
**(Common Law Fraud)**

332.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

333.    BandB Supply and Bobkov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Equipment.

334.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that BandB Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact BandB Supply was not lawfully licensed as they failed to obtain a Dealer in Products License; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to

financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Fraudulent Equipment was less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

335.    BandB Supply and Bobkov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BandB Supply that were not compensable under New York no-fault insurance laws.

336.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $37,000.00 pursuant to the fraudulent bills submitted by BandB Supply and Bobkov.

337.    BanaB Supply and Bobkov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

338.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against BandB Supply and Bobkov**
**(Unjust Enrichment)**

339.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

340.    As set forth above, BandB Supply and Bobkov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

341.    When GEICO paid the bills and charges submitted by or on behalf of BandB Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

342.    BandB Supply and Bobkov have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that BandB Supply and Bobkov voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

343.    BandB Supply and Bobkov's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

344.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $37,000.00.

**TENTH CAUSE OF ACTION**
**Against Westend Supply and Bobkov**
**(Common Law Fraud)**

345.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

346.    Westend Supply and Bobkov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Equipment.

347.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Westend Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Westend Supply was not lawfully licensed as they failed to obtain a Dealer in Products License; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Fraudulent Equipment was less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible

reimbursement amount.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

348.    Westend Supply and Bobkov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Westend Supply that were not compensable under New York no-fault insurance laws.

349.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted by Westend Supply and Bobkov.

350.    Westend Supply and Bobkov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

351.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH  CAUSE OF ACTION
**Against Westend Supply and Bobkov**
**(Unjust Enrichment)**

352.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

353.    As set forth above, Westend Supply and Bobkov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

354.    When GEICO paid the bills and charges submitted by or on behalf of Westend Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

355.    Westend Supply and Bobkov have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Westend Supply and Bobkov voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

356.    Westend Supply and Bobkov's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

357.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $223,000.00.

## JURY DEMAND

358.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Monac Supply, Vue Supply, BandB Supply, and Westend Supply, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the DME Entities have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against Bobkov for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $357,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Bobkov and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $357,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Monac Supply and Bobkov for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Monac Supply and Bobkov for more than $57,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Vue Supply and Bobkov for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $39,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Vue Supply and Bobkov for more than $39,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against BandB Supply and Bobkov for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $37,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against BandB Supply and Bobkov for more than $37,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Westend Supply and Bobkov for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $223,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against Westend Supply and Bobkov for more than $223,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  March 11, 2025
        Uniondale, New York

                                    RIVKIN RADLER LLP


                                    By:    /s/ Barry I. Levy
                                          Barry I. Levy (BL 2190)
                                          Michael A. Sirignano (MS 5263)
                                          Michael Vanunu (MV 4167)
                                          Philip P. Nash (PN 0519)
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                    (516) 357-3000

                                    *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*